UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **MARWAN MAROUF**, §<br>§<br>PLAINTIFF, §<br>§<br>V. §<br>§<br>**JOSEPH EDLOW**, IN HIS OFFICIAL §<br>CAPACITY AS DIRECTOR OF THE U.S. §<br>CITIZENSHIP AND IMMIGRATION SERVICES, §<br>**KRISTI NOEM**, IN HER OFFICIAL §<br>CAPACITY AS SECRETARY OF THE U.S. §<br>DEPARTMENT OF HOMELAND SECURITY, §<br>**MICHELLE MONTGOMERY**, IN HER §<br>CAPACITY AS FIELD OFFICE DIRECTOR OF §<br>U.S. CITIZENSHIP AND IMMIGRATION §<br>SERVICES DALLAS FIELD OFFICE §<br>§<br>DEFENDANTS. § | Civil Action No.: |

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADMINISTRATIVE PROCEDURE ACT**

Plaintiff Marwan Mohammad Ahmad Marouf ("Mr. Marouf or Plaintiff") by and through the undersigned counsel, hereby files this complaint for declaratory and injunctive relief, and in support of this complaint states the following:

**INTRODUCTION**

1. Plaintiff was first admitted to the United States on a nonimmigrant F-1 Student Visa status on or about August 3, 1991, in New York City, NY, to pursue a Bachelor's degree at Louisiana State University in Baton Rouge, LA. After completing his Bachelor's degree in May 1995, Plaintiff's F-1 status was extended to December 31, 1999, while he pursued a master's degree, which he completed in December 1998 at the University of Texas at Dallas.

1

2. On February 3, 1999, Plaintiff's status was changed to H-1B visa to work as a Network Systems Engineer at telecom company, Nortel Networks, which was extended to February 2, 2011.

3. On April 25, 2007, Nortel Networks Inc. filed a Form I-140, Immigrant Petition for Alien Worker, on Plaintiff's behalf. This Form I-140 was approved on May 2, 2007, with a priority date of May 27, 2003. On March 10, 2010, Ericsson Inc., successor in interest to Nortel Networks Inc., filed a Form I-140 on Plaintiff's behalf, which was approved on May 18, 2010, maintaining the priority date of May 27, 2003.

4. On August 18, 2010, Mr. Marouf filed Form I-485 Application to Register Permanent Residence or to Adjust Status ("2010 I-485") under the employment-based 3rd Preference category, as well as an Employment Authorization Document and Advance Parole. Plaintiff made his last entry into the U.S. lawfully, and with inspection after presenting a valid, unexpired Form I-512L Authorization for Parole that was approved prior to his departure, to resume the processing of his pending application for adjustment of status. Thereafter, USCIS denied Plaintiff's 2010 I-485 application on October 1, 2014.

5. DHS refused to pursue removal proceedings following its 2014 denial of Plaintiff's 2010 I-485 application, despite a request from Plaintiff on May 4, 2015, through his then counsel.

6. Subsequently, Plaintiff's U.S. citizen son turned 21, and he filed a Form I-130, Petition for Alien Relative, on Mr. Marouf's behalf on March 10, 2020. Plaintiff filed a second Form I-485, Application to Register Permanent Residence or to Adjust Status, in the Immediate Relative category based on this pending petition on June 25, 2020 ("2020 I-485"). USCIS interviewed Plaintiff on July 21, 2021, and approved his son's I-130 Petition for Alien Relative in the Immediate Relative category on August 5, 2021.

7. On September 22, 2025, ICE Enforcement and Removal Officers detained Mr. Marouf, and they provided him with USCIS's decision,[1] dated that same day, regarding his 2020 I-485 application, and purported to have served him with a Form I-862 Notice to Appear ("NTA"). DHS did not file its initial NTA charging Plaintiff as deportable under Section 237(a)(1)(B) of the INA with the Court. DHS did file its superseding Form I-862 with this Court on October 2, 2025, charging the Plaintiff as inadmissible under INA § 212(a)(7)(A)(i)(I) as "…an [immigrant] who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act..."

8. On October 16, 2025, DHS filed a Form I-261 amending its charges against the Plaintiff and charged his as inadmissible under INA § 212(a)(3)(B)(iv)(IV)(cc) (solicitation of funds) and § 212(a)(3)(B)(iv)(VI)(dd) (material support to terrorism).

9. Mr. Marouf currently remains in active removal proceedings.

## JURISDICTION AND VENUE

10. This action arises under the United States Constitution and the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101 et seq. ("INA") and its subsequent amendments.

11. This Court has jurisdiction over this action under the Administrative Procedures Act ("APA"), which authorizes federal courts to hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, contrary to constitutional right, or otherwise not in accordance with law. 5 U.S.C. § 706.

12. Although Defendants may attempt to invoke the Immigration and Nationality Act's (INA) jurisdiction-stripping provisions, this action falls squarely within the statutory and

---

[1] Exhibit A – USCIS Notice of Decision – September 22, 2025

constitutional exceptions preserving judicial review of questions of law and due process violations. Pursuant to 8 U.S.C. § 1252(a)(2)(D), courts maintain jurisdiction for judicial review of "constitutional claims or questions of law."

13. This action targets USCIS's failure to follow binding procedures and its misapplication of statutory standards—not any discretionary weighing of equities. Where plaintiffs "assert violations of [their] procedural rights, and seek procedural remedies," the suit is not jurisdiction-barred as a challenge to "discretionary" decisions.

14. Plaintiff seeks review of two legal and constitutional errors:

    a. USCIS's imputing the knowledge required to satisfy 212(a)(3)(B) to Mr. Marouf based primarily on his acquaintance with some of the defendants in the Holy Land Foundation criminal case is a gross misapplication of the "know" or "reasonable should know" standard; and

    b. USCIS's overbroad and unconstitutional application of the Tier III "material support" and "solicitation of funds" bars in 8 U.S.C. § 1182(a)(3)(B), as applied to benign or humanitarian acts, does not meet the statutory definition. Because these are pure legal and constitutional issues, the Court retains jurisdiction under 8 U.S.C. § 1252(a)(2)(D) and 28 U.S.C. § 1331.

15. USCIS failed to adhere to the due process standards of the Fifth Amendment in its review of the totality of the record.

16. Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(e)(1)(B), because Defendants are officers and employees of the United States, or an agency thereof, acting in their official capacity, and this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## PARTIES

17. Plaintiff, Marwan Marouf, is a 54-year-old Kuwait-born citizen of Jordan. He was paroled into the United States on August 8, 2011. Mr. Marouf is currently detained at the Bluebonnet Detention Facility as of September 23, 2025.

18. Defendant, Kristi Noem, is the Secretary of the U.S. Department of Homeland Security ("DHS"), whose office address is 245 Murray Lane, Building 410, SW, Washington, DC 20528.

19. Defendant, Joseph Edlow, is the Director of U.S. Citizenship and Immigration Services ("USCIS"), whose office address is USCIS, 20 Massachusetts Ave, NW, Washington, DC 20529.

20. Defendant, Michelle Montgomery, is the Field Office Director for the USCIS Field Office in Dallas, Texas, whose office address is 6500 Campus Cir Dr E, Irving, TX 75063.

21. Each Defendant is sued in his or her official capacity. Defendants, Kristi Noem, Joseph Edlow, and Michelle Montgomery are responsible for the adjudication of Plaintiff's Application to Register Permanent Residence or Adjust Status pursuant to 8 U.S.C. § 1255.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

22. Further pursuit of administrative relief, such as a motion to reopen or reconsider, would be futile because the DHS has predetermined the issue. *See Darby v. Cisneros*, 509 U.S. 137 (1993); *McCarthy v. Madigan*, 503 U.S. 140 (1992) (exhaustion excused where remedies are inadequate or futile); *Andrade v. Gonzales*, 459 F.3d 538, 544 (5th Cir. 2006) (courts retain jurisdiction over pure questions of law); *see also El Rescate Legal Services, Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 747 (9th Cir. 1992) (where the

agency's position "appears already set," administrative remedies would be futile and are not required).

23. The Supreme Court has clarified that exhaustion of administrative remedies is not a prerequisite to judicial review where the pursuit of administrative remedies would be futile.

24. Likewise, the Fifth Circuit recognizes that exhaustion may be excused when the issue presents a pure question of law or constitutional claim or where administrative remedies are inadequate, ineffective, or futile. *Andrade*, 459 F.3d at 544.

**CONTROLLED APPLICATION REVIEW AND RESOLUTION PROGRAM ("CARRP")**

25. In April 2008, USCIS created CARRP, an agency-wide policy for identifying, processing, and adjudicating applications for certain immigration benefits, including adjustment of status. The program remained unknown and undisclosed to the public until it was eventually uncovered during discovery in a district court action challenging an unlawful naturalization denial. The CARRP's policies and procedures have come to light because of the Government's production of documents in connection with Freedom of Information Act ("FOIA") requests and FOIA litigation. The FOIA requestor has disseminated the FOIA productions to the public at https://www.aclusocal.org/sites/default/files/wp-content/uploads/2013/01/Second-FOIA-Request-May-17-2012.pdf.

26. Under CARRP, USCIS officers screen applications for "national security concerns." If an application is selected for processing under CARRP, USCIS removes the application from the agency's routine adjudication track and places it on a separate CARRP track.

27. Applications flagged for treatment under CARRP are subject to an entirely distinct set of adjudicatory procedures that lack any authority or foundation in statute or regulation. With only limited exceptions, CARPP mandates denial or perpetual delay of applications placed

on its adjudications track regardless of the applicant's statutory eligibility for the requested benefit.

28. CARRP's criteria for inclusion in its separate, extra-legal adjudications track are not tethered to any of the statutory requirements governing adjustment of status. Under CARRP, a person is considered to pose a "national security concern" if it is determined that he or she has an "articulable link to prior, current, or planned involvement in, or association with, an activity, individual or organization" that has engaged in terrorist activity or been a member of a terrorist organization. Because of CARRP's expansive and overbroad definition of "national security concern," an adjustment of status applicant can be subjected to adjudication under CARRP even though he or she is not personally suspected of engaging in any unlawful activity or joining any unlawful organization.

29. CARRP relies on flawed Government databases to decide who will be subject to its adjudication procedures. Under CARRP, any individual whose name appears on the FBI's Terrorist Screening Database ("TSDB") is considered to be a "Known or Suspected Terrorist" ("KST") and is automatically subjected to CARRP. Nominations to the TSDB are governed by selection criteria which permits individuals to be included in the database even if there is no reasonable suspicion that the person is actually involved in terrorist activity. And the TSDB has come under widespread criticism for mismanagement and failures on the part of the FBI to adequately screen out individuals who pose no national security threat. As a result of the TSDB's over-inclusive selection criteria and inadequate procedures for ensuring proper screening, the database is enormous; in 2009, it included roughly 400,000 individuals, and it is certainly much larger now. By making an individual's inclusion on the TSDB an automatic trigger for processing under CARRP, the program

sweeps in a substantial number of statutorily-eligible applicants for naturalization who pose no security risk to the United States.

30. Adjustment applicants who are not included on the TSDB and not branded as a KST can nevertheless be subject to CARRP if a USCIS officer determines that there are "indicators" that the person's application presents a "national security concern." Some of these "indicators" are defined by reference to statutory provisions concerning inadmissibility and removability unrelated to the statutory adjustment of status criteria. Further, these "indicators" are defined more broadly than the provisions they reference in the INA: to be selected for CARRP, "the facts of the case do not need to satisfy the legal standard used in determining admissibility or removability" under the incorporated provisions.

31. Still other CARRP "indicators" are completely untethered from any statutory provision. Such "indicators" include "travel through or residence in areas of known terrorist activity" and the identities of the person's family and associates, broadly defined.

32. Once an individual is flagged as a "national security concern" pursuant to CARRP, adjudication of the application no longer proceeds on a normal track; instead, it becomes subject to a parallel set of adjudicatory rules applied only to those selected for CARRP.

33. At each step in the processing of an application subject to CARRP, adjudication is steered toward one of two outcomes: delay or denial.

34. In the initial stages in the adjudication of an application subject to CARRP, USCIS officers are instructed to perform an enhanced "eligibility assessment" to determine whether the applicant qualifies for the benefit. In the Orwellian world of CARRP, such "assessment" is far from the neutral review its name would suggest. To the contrary, CARRP instructs officers performing an "eligibility assessment" to search for any possible basis to deny an

application so that "valuable time and resources are not unnecessarily expended" on investigating the supposed "national security concern" that triggered the application's selection for CARRP. Upon information and belief, eligibility assessments for applications subject to CARRP thus often lead to the pretextual denials that lack a legitimate basis in fact and law and would not have been issued had the application been reviewed without the eye toward denial CARRP demands.

35. CARRP also cedes USCIS's control over the adjudication of AOS applications to other federal agencies that lack statutory authority over immigration matters. Under CARRP, the law enforcement agency that "owns" the derogatory information on which the application's selection for CARRP is based can directly influence the ultimate decision on the naturalization application. Thus, Executive agencies without any statutory authority over immigration matters can, under CARRP, request that a naturalization application be denied, granted, or held in abeyance indefinitely pending the agency's own investigation.

36. Upon information and belief, USCIS often delays or denies naturalization applications subject to CARRP because law enforcement agencies outside of the Department of Homeland Security, and lacking any statutory authority over adjustment of status matters, request such a decision, and not because USCIS independently concludes that the applicant is statutorily ineligible to adjust status. In fact, when an applicant is subjected to CARRP as a KST because the applicant is listed on the TSDB (a database maintained by the FBI), CARRP imposes an absolute prohibition on USCIS field officers granting adjustment, even if the applicant has satisfied all statutory and regulatory criteria.

37. Upon information and belief, adjudication of AOS applications subject to CARRP is often delayed when USCIS cannot find a reason to deny the application. When an applicant files

a mandamus action, and thereby makes indefinite delay no longer viable, USCIS field officers will deny a statutorily-eligible applicant because CARRP prevents such officers from issuing an approval.

38. At no point during the CARRP process is the applicant informed of the basis for his or her application's inclusion in CARRP, nor even that that his or her application will be subjected to CARRP at all. No mechanism exists for an applicant to contest his or her application's selection for CARRP.

39. CARRP effectively creates two substantive regimes for the administrative adjudication of AOS applications: one for applications subject to CARRP, and one for all other applications. CARRP rules and procedures create substantive eligibility criteria that have no grounding in any of the statutes or regulations governing the AOS process.

## ADJUSTMENT OF STATUS FRAMEWORK

40. To qualify for adjustment of status to that of a lawful permanent resident under INA 245a, a family-based applicant must satisfy statutorily established prerequisites. The applicant must have been inspected and admitted or paroled into the United States. He must properly file an adjustment of status application and must be in the United States. Additionally, he must be eligible to receive an immigrant visa. The applicant must be admissible to the United States for lawful permanent residence or eligible for a waiver of inadmissibility or other form of relief. Last, the applicant must merit a favorable exercise of discretion.

41. Applicants for permanent residence initiate the process by submitting USCIS's Form I-485 Application to Register Permanent Residence or Adjust Status and the required fees. After an application is submitted, an applicant must attend an examination at the local USCIS field office with jurisdiction over the place of the applicant's residence.

42. Mr. Marouf was inspected by CBP, who paroled him into the United States on August 8, 2011, pursuant to USCIS's grant of Advance Parole, which allowed him to lawfully enter the U.S. to resume processing of the 2010 I-485 application.

## CAUSES OF ACTION

### Count I: Violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706

43. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 44 above.

44. INA § 212(a)(3)(B) defines "engaging in terrorist activity" to include certain acts of "material support" or "solicitation of funds" for a designated terrorist organization, but only where the individual "knows, or reasonably should know," that the recipient organization is engaged in terrorist activity.

45. The statutory phrase "reasonably should know" codifies an objective, negligence-like standard, which asks whether a reasonable person in the applicant's position, based on available and accessible information at the time, should have been aware of the organization's involvement in terrorism.

46. Congress intentionally adopted this language to ensure that the terrorism bars do not unfairly ensnare individuals who acted with innocent intent, particularly in contexts of humanitarian, religious, or charitable assistance.

47. By using the "reasonably should know" standard, Congress required adjudicators to assess the context, visibility, and accessibility of information, and to avoid imputing knowledge where a reasonable person would not have recognized a connection to terrorism.

48. In denying Plaintiff's application for adjustment of status, USCIS concluded that Plaintiff was inadmissible under INA § 212(a)(3)(B) based on a finding that Plaintiff knew or

"reasonably should have known" that certain recipients of humanitarian assistance were allegedly affiliated with a Tier III undesignated terrorist organization.

49. USCIS's determination reflects a fundamental misapplication of the statutory standard. The agency equated "should have known" with constructive or imputed knowledge, treating any indirect association or geographic proximity as sufficient to establish inadmissibility.

50. The correct interpretation of the statute, consistent with its text and legislative purpose, requires that the government demonstrate that a reasonable person, with access to the same information and in the same circumstances as the applicant, would have recognized a substantial likelihood that the organization engaged in terrorism.

51. The objective standard should be based on information available from the U.S. government, which determines which organizations were impermissible.

52. Plaintiff's contributions and activities consisted solely of benign humanitarian support, such as providing ordering food for children at events, arranging for a clown for children at a Holy Land Foundation ("HLF") event, sponsoring an orphan through monthly donations, and delivering zakat (mandatory religious giving) pooled by community members to the charity they designated to receive it. There was no evidence that Plaintiff had access to, or was aware of, any information suggesting that these efforts were connected to a group involved in terrorist acts because the government's own mechanisms did not identify it as an organization supporting terrorism.

53. Mr. Marouf testified under oath that he did not know that HAMAS controlled any of the Zakat Committees in Palestine as part of its social wing, and he could not reasonably have known this fact based on information available to him. Additionally, he testified that because HLF was operating as a legally registered U.S. charity at the time of his volunteer

work, he believed it was operating within the confines of U.S. law when providing this humanitarian aid. In fact, the U.S. government provided funds to the same humanitarian committees it later deemed impermissible.

54. There is no evidence that any member of HLF leadership ever told or insinuated to Mr. Marouf that the organization was providing support to HAMAS's social wing by funding humanitarian aid through the Zakat Committees. Indeed, the members of leadership with whom Mr. Marouf was acquainted all maintained that they had no knowledge that the aid to the Zakat Committees was considered supporting HAMAS's social wing and vigorously defended themselves against these accusations.

55. USCIS's conclusion that Plaintiff "should have known" is unsupported by substantial evidence and contrary to law, because the record demonstrates that no reasonable person could have inferred HLF was materially supporting terrorism based on the publicly available facts at the time.

56. In 2007, the first trial of the HLF leadership ended in a mistrial. Most of the evidence DHS cited in support of its conclusions about Mr. Marouf materially supporting a Tier III terrorist organization is from the HLF trials or secondary sources from December 2001 or later that do not support its conclusion.

57. USCIS mischaracterizes Plaintiff's testimony regarding knowledge about HLF internal decision-making and its leadership. In 2013, five years after the 2008 trial, some sessions of which Plaintiff attended, and conviction of multiple HLF leaders, USCIS asked Plaintiff about his knowledge of the reported association between HLF and HAMAS through the Zakat Committees. During the interview, Plaintiff acknowledged that at the time of the interview in 2013, he was aware of the allegations against HLF.

58. In effect, USCIS has transformed the statutory "reasonably should not know" standard into a strict liability regime, penalizing humanitarian conduct without evidence of awareness or intent. This interpretation exceeds the bounds of the statute and violates the Fifth Amendment's guarantee of fundamental fairness and due process.

59. The agency's decision to impose inadmissibility under § 212(a)(3)(B) on these facts was arbitrary, capricious, and not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

60. USCIS failed to apply the proper reasonableness inquiry, failed to identify any evidence supporting that Plaintiff had reason to know of purported material support of terrorism, and disregarded the statutory intent to protect individuals engaged in purely humanitarian or charitable acts who had no reasonable ability to know it would be considered material support.

61. The agency's misapplication of the "should have known" standard mirrors the kind of irrational statutory interpretation the Supreme Court has condemned in *Judulang v. Holder*, 565 U.S. 42 (2011), and *INS v. St. Cyr*, 533 U.S. 289 (2001).

62. Accordingly, USCIS's decision must be set aside and remanded with instructions to apply the correct legal standard, assessing whether a reasonable person in Plaintiff's position should not have known—based on accessible facts and context—that any beneficiary of support was engaged in terrorism.

### Count II: Fifth Amendment – Substantive Due Process Violation

63. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 44 above.

64. By punishing Plaintiff for humanitarian acts without proof of knowledge or reason to know of any wrongdoing, USCIS's application of § 212(a)(3)(B) violates substantive due process under the Fifth Amendment.

65. The government's interpretation chills constitutionally protected charitable, religious, and humanitarian conduct and imposes guilt by association, contrary to the principles of due process and proportionality.

### Count III: Fifth Amendment – Equal Protection Selective Enforcement

66. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 44 above.

67. Plaintiff's detention stems from selective enforcement based on his Palestinian heritage and Muslim faith. The denial's reliance on imputed knowledge based solely on guilt by association violates the Fifth Amendment's Equal Protection Clause. *See Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002) (selective enforcement actionable).

### Count IV: Violation of the Accardi Doctrine/Agency Failure to Follow Its Own Regulations and Policies

68. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 44 above.

69. Under the Accardi doctrine (*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)), a federal agency must follow the rules, regulations, and binding policies that it has promulgated. Agency action that ignores those binding procedures is unlawful, arbitrary, and capricious within the meaning of the APA. 5 U.S.C. § 706(2)(A).

70. 2. DHS and USCIS are bound by the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1255, and implementing regulations at 8 C.F.R. §§ 245.1–245.25 governing adjudication of adjustment of status applications.

71. These provisions, along with 8 C.F.R. § 103.2(b) and the USCIS Policy Manual require that USCIS:

    a. base decisions solely on the evidentiary record;

    b. provide notice and an opportunity to respond to adverse information (8 C.F.R. § 103.2(b)(16));

    c. adjudicate cases fairly and uniformly; and

    d. apply statutory grounds of inadmissibility consistent with law and established interpretive guidance.

72. Defendants violated these mandatory procedural and substantive obligations by subjecting Plaintiff's application to CARRP.

73. CARRP is not authorized by statute or regulation and operates in direct conflict with the INA and the APA's requirement of individualized, evidence-based adjudication.

74. In applying CARRP, Defendants departed from binding agency procedures by:

    a. referring Plaintiff's application for "national security" review despite the absence of any statutory bar under INA § 212(a)(3)(B);

    b. relying on undisclosed interagency assessments and classified data without allowing Plaintiff a meaningful opportunity to rebut adverse inferences;

    c. delaying and ultimately denying adjudication based on internal policy criteria that have no basis in the INA, the CFR, or the USCIS Policy Manual; and

    d. concealing the CARRP designation and underlying criteria from Plaintiff in violation of 8 C.F.R. § 103.2(b)(16)(i).

75. Defendants further violated the Accardi Doctrine by misapplying INA § 212(a)(3)(B) in a manner inconsistent with statute.

76. In Plaintiff's case, Defendants:

    a. applied an overbroad interpretation of "solicitation" directed toward a non-designated, Tier III entity; and

    b. failed to conduct a meaningful "knowledge" analysis required by law.

77. These actions constitute clear departures from binding law, regulations, and agency procedure, in violation of the Accardi doctrine.

78. The denial of Plaintiff's adjustment application was arbitrary, capricious, contrary to law, and issued without observance of the procedure required by law, in violation of 5 U.S.C. § 706(2)(A), (C), and (D).

79. Plaintiff is entitled to declaratory and injunctive relief setting aside Defendants' unlawful decision and directing proper adjudication of the adjustment application consistent with statutory and regulatory requirements.

**ATTORNEY'S FEES**

80. The Equal Access to Justice Act ("EAJA"), as amended 5 U.S.C. § 504 and 28 U.S.C. § 2412, provides for the award of costs and attorneys' fees to a prevailing party in litigation against the United States or one of its agencies.

81. As a result of Defendants' unlawful actions, Plaintiff was required to retain counsel. Because Defendants were not substantially justified in pursuing their actions, Plaintiff is entitled to recover legal fees and all costs and expenses under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412.

82. Plaintiff respectfully requests that this Court grant him costs and fees as provided for by the EAJA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court:

1. Retain jurisdiction over this matter to ensure compliance;

2. Declare unlawful and set aside USCIS's denial for failure to follow §103.2(b)(16) and misapplication of the "reasonably should know" standard;

3. Declare that USCIS's misapplication of the "should have known" standard under INA § 212(a)(3)(B) was contrary to law and due process;

4. Vacate and set aside Defendants' denial of Plaintiff's application for adjustment of status under 5 U.S.C. § 706(2)(A), (C), and (D);

5. Remand the matter to USCIS for adjudication consistent with the proper "reasonably should have known" standard;

6. Declare that Defendants' use of the CARRP or any similar secret or extra-regulatory process to delay or deny Plaintiff's immigration benefit is ultra vires, unauthorized by statute or regulation, and unlawful under the APA;

7. Enjoin Defendants, their agents, and successors from applying or enforcing CARRP or any similar "national security" screening policy not authorized by statute or regulation in the adjudication of Plaintiff's or similarly situated applicants' immigration benefits;

8. Issue a Temporary Restraining Order prohibiting DHS from moving Plaintiff out of the jurisdiction of the court pending a decision on this matter;

9. Award Plaintiff reasonable attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

10. Grant such other relief as this Court deems just, proper, and equitable.

Dated: October 29, 2025                             Respectfully submitted,

/s/ Franchel D. Daniel
**Franchel D. Daniel**
TX Bar 24103746
franchel.daniel@mlfa.org
**Kathryn H. Brady**
TX Bar 24033620
kate.brady@mlfa.org
**Marium Uddin**
TX Bar 24029874
marium.uddin@mlfa.org

**Muslim Legal Fund of America**
100 N. Central Expressway
Suite 1010
Richardson, TX 75080
Telephone: (972) 914-2507

**COUNSEL FOR PLAINTIFF**